IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION

| | |
|---|---|
| GWEN HART, JOSEPH DRUTHER, LUCILLE DRUTHER, EDWARD WUELLNER, and JENNIFER WUELLNER, individually and on behalf of all others similarly situated,<br><br>     Plaintiffs,<br><br>  vs.<br><br>LOUISIANA-PACIFIC CORPORATION,<br><br>     Defendant. | Civil Action No. 2:08-cv-00047-BO |

## DEFENDANT LOUISIANA-PACIFIC CORPORATION'S
## MEMORANDUM IN SUPPORT OF MOTION TO DECERTIFY CLASS

Pursuant to this Court's January 2, 2013 Order and Federal Rules of Civil Procedure 7(b) and 23(c)(1)(C), Defendant Louisiana-Pacific Corporation ("LP") submits this Memorandum in Support of LP's Motion to Decertify Class. As explained below, discovery has demonstrated that (a) individualized and unique issues concerning ascertainability of the product, damages, and causation will predominate over any alleged common questions, and (b) the issues of product defect and unconscionability, advanced by Plaintiffs Gwen Hart, Joseph Druther, Lucille Druther, Edward Wuellner, and Jennifer Wuellner ("Plaintiffs") as the central questions in this litigation shared by all putative Class Members, are both unsupported by the evidence and insufficient to warrant class treatment. Thus, this Court should enter the attached Order decertifying the class and directing Plaintiffs to pursue their claims solely on an individual basis.

# INTRODUCTION

Under the Federal Rules and pursuant to well-settled case law in this Circuit, class certification remains provisional and subject to change throughout the course of litigation. In the event discovery reveals evidence demonstrating that class treatment no longer is warranted, decertification of the class is appropriate.

In their Motion for Class Certification, Plaintiffs represented to this Court that, among other things, (1) all TrimBoard is uniformly defective and/or failing and needs to be replaced, (2) all Plaintiffs and Class Members suffer substantially identical damages caused by that defect, and (3) the central issue in the litigation is Plaintiffs' claim that the terms and limitations of LP's 10/5 Year Limited Express Warranty for TrimBoard (the "LP Warranty") are unconscionable. These representations were relied upon explicitly by this Court in its decision to grant certification of the class.

Discovery has failed to support Plaintiffs' representations. Countless examples of TrimBoard performing as intended and as warranted by LP have been found. On this point, Plaintiffs' expert Martin Phillips admitted:

> Q:  . . . [W]eren't there some houses altogether where you found no visible damage to the TrimBoard?
>
> A:  Yes.

See Deposition of Plaintiffs' Expert Martin Phillips, taken April 26, 2012, attached hereto as Exhibit 1, at 111:3 to 111:5. It cannot be maintained that TrimBoard is uniformly defective and fails inevitably under any circumstances.

Moreover, experts in construction practices for Plaintiffs have noted a wide range of potential causes for damage to TrimBoard on particular structures, identifiable only upon intensive and destructive testing of the materials at issue, some of which are related to

installation or maintenance issues rather than any product defect. In his deposition, Plaintiffs' expert Drew Brown admitted:

> Q: And when you would inspect the site visually it's difficult to tell how much of the trim board has been damaged, correct?
>
> A: Yes. It's – yes. I'll say this. It's impossible to say that it's performing without doing more than just a visual inspection.
>
> Q: And it's impossible to tell the extent and cause of damage underneath that trim board, if any, without more than a visual inspection, correct?
>
> A: That's correct.

See Deposition of Plaintiffs' Expert Drew Brown, taken September 13, 2012, attached hereto as Exhibit 2A, at 141:17 to 142:1. Thus, it is readily apparent that adjudication of Plaintiffs' and Class Members' claims will require individualized and unique determinations of both damages and causation, raising the prospect of this Court having to conduct as many as 11,000 mini-trials to resolve these issues.

The claims history of this product also demonstrates that the vast majority of TrimBoard in North Carolina has performed well. According to Plaintiffs, there are "as many as 11,258 homes in North Carolina containing defective Trimboard." See Plaintiffs' Memorandum in Support of Motion to Certify Class, Doc. No. 75, at 10. Nevertheless, despite the fact that TrimBoard was sold from 1994 to 2008, Plaintiffs concede that there have been "only about 50" claims in North Carolina. Id. at 28; see also Affidavit of Vernon Tilley, attached hereto as Exhibit 3, at ¶ 8 (noting 55 claims). This is a claims rate of less than one-half of one percent (0.44%).

Further, the question of whether the terms and limitations contained in the LP Warranty are unconscionable fails to justify class treatment. Plaintiffs' unconscionability theory is

premised upon the existence of an underlying defect that will result inevitably in the failure of all TrimBoard, a premise which discovery has refuted. Plaintiffs' expert Drew Brown admitted:

> Q:   But you will agree with me there have been some trimboards that are not
>      damaged at all on the structures you have reviewed?
>
> A:   Yes.
>
> Q:   And that's true with respect to every structure you have reviewed, correct?
>
> A:   Yes.

<u>See</u> Deposition of Plaintiffs' Expert Drew Brown, taken September 13, 2012, attached hereto as Exhibit 2A, at 57:6 to 57:12. Even if Plaintiffs could overcome that hurdle, the core issues of ascertainability, damages, and causation nevertheless will exist for each Class Member regardless of whether the LP Warranty is found to be unconscionable on a class basis. For these reasons, Plaintiffs' claims are not appropriate for class treatment, and LP requests respectfully that this Court grant LP's Motion to Decertify.

## <u>STATEMENT OF THE CASE</u>

On November 5, 2010, Plaintiffs submitted their Motion to Certify Class, which sought to have this Court certify a class consisting of "[a]ll persons in the State of North Carolina who own a home, office or other building in which ABTCO's trimboard ('Trimboard') has been installed in the past 10 years." <u>See</u> Plaintiffs' Motion to Certify Class, Doc. No. 73, at 1. In support of their Motion, Plaintiffs purported to identify ten "common" questions, all of which "relate[d] to a course of conduct by Defendant arising out of a common nucleus of operative facts, *i.e.*, its producing and selling a defective product, its decision to continue to produce and market that product despite its knowledge of the defects, and its efforts to hide the nature of the defects from consumers such as Plaintiffs and members of the proposed Class." <u>See</u> Plaintiffs' Memorandum in Support of Plaintiffs' Motion to Certify Class, Doc. No. 75, at 20-22. According to Plaintiffs,

"[t]he only real difference among class members is the amount of Trimboard on their structures and the amount of damages, which can easily be calculated based on the amount of Trimboard that needs to be replaced on each structure." Id. at 22-23.

Specifically with regard to the "predominance" requirement of Rule 23(b)(3), Plaintiffs represented that "[c]ommon issues predominate here because this case involves one common defect, in one product, produced by one manufacturer. The issue of product defect will be determined entirely from class-wide expert evidence; additional class-wide liability evidence will relate to LP's conduct and Plaintiffs' claims that LP negligently designed and manufactured the Trimboard. These crucial facts that relate to the defective nature of LP's Trimboard and its misconduct are essentially the same for all Class Members and should thus be established on a class-wide basis."[1] Id. at 25.

This Court entered an Order certifying Plaintiffs' proposed class on July 18, 2011. See Order, dated July 18, 2011, Doc. No. 100. In so doing, this Court accepted at face value Plaintiffs' representations regarding purported "common" questions, noting that "Plaintiff alleges (sic) that the Defendant knew of the inherent defect, hid that defect from the public, and issued a one-sided warranty containing unconscionable terms that served only to limit liability. If this is the case, the Court may be empowered to alter the terms of that warranty or void it completely, and then award appropriate damages through N.C. Gen. Stat. § 25-2-302." Id. at 6-7. As to

---

[1] According to Plaintiffs, the alleged "common" thread tying together the claims of all Class Members, upon which this Court relied in granting class certification, related to Plaintiffs' allegations that that TrimBoard is inherently defective and inevitably fails under all circumstances. See Plaintiffs' Memorandum in Support of Motion to Certify Class, Doc. No. 75, at 25. Nevertheless, as is evident from the face of Plaintiffs' Amended Complaint, as this Court acknowledged in its Order in response to LP's Motions for Partial Judgment and Judgment on the Pleadings, Plaintiffs assert in this litigation only a single, narrow claim: breach of express warranty. See Plaintiffs' Amended Complaint, Doc. No. 41; Order, dated November 19, 2009, Doc No. 47, at 2. Plaintiffs did not bring against LP a cause of action for product defect, nor is product defect an element of a claim based upon breach of express warranty. See Harbour Point Homeowners Assoc., Inc v. DJF Enterprises, 697 S.E.2d 439, 447 (N.C. App. 2010). Furthermore, as explained in further detail herein, discovery has demonstrated that TrimBoard is not a defective product.

predominance, this Court adopted Plaintiffs' contention that "the only real difference among proposed class members is the amount of Trimboard on their structures and the amount of their damages." Id. at 9.

Following extensive discovery, on January 2, 2013, this Court issued an Order directing the parties to brief again the issue of class certification.  See Order, dated January 2, 2012, Doc No. 155.  Pursuant to that Order, LP submits the present Motion to Decertify.[2]

## STANDARD OF REVIEW

Rule 23(b)(3) provides that a class action may be maintained if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Rule 23(b)(3).  "Considering whether 'questions of law or fact common to class members predominate' begins . . . with the elements of the underlying cause of action."  Erica P. John Fund, Inc. v. Halliburton Co., 131 S. Ct. 2179, 2184 (2011).  Thus, it is not sufficient for plaintiffs merely to invent general or abstract questions that apply to the class they propose to represent; rather, the common questions must advance the claims of the individual Class Members, i.e., they must be material to the elements of the claim asserted.  Parks Auto. Group, Inc. v. Gen. Motors Corp., 237 F.R.D. 567, 570 (D.S.C. 2006).  Plaintiffs, as the party seeking to maintain class certification, bear the burden of demonstrating affirmatively their compliance with Rule 23's requirements.  See Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551 (2011) ("Rule 23 does not set forth a mere pleading standard.  A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is,

---

[2] For the sake of brevity requested by the Court, facts pertinent to the question of class decertification are set forth in the Argument section of LP's Memorandum.

he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc.").[3]

This Court possesses "wide discretion" to decertify a class pursuant to Rule 23(c)(1)(C), which provides that a court may issue an order altering or amending an order granting class certification at any time before final judgment is entered. Ward v. Dixie Nat'l Life Ins. Co., 595 F.3d 164, 179 (4th Cir. 2010); Rule 23(c)(1)(C). As the United States Court of Appeals for the Fourth Circuit has observed, "certification is conditional," and should class certification prove inappropriate at any point during the course of litigation, the court "may simply decertify the class." Brown v. Nucor Corp., 576 F.3d 149, 159 (4th Cir. 2009). Once "it becomes apparent that individual damage issues will predominate or render the case unmanageable," the court has the responsibility to decertify the class. Gunnells v. Healthplan Servs., 348 F.3d 417, 433 (4th Cir. 2003).

For example, in Marlo v. United Parcel Service, Inc., 251 F.R.D. 476 (C.D. Cal. 2008), the District Court initially certified, pursuant to Rule 23, a class composed of several categories of California UPS employees who asserted claims involving defendant's alleged failure to pay overtime compensation and failure to provide meal and rest breaks. Id. at 479. Three years later, following lengthy discovery, extensive motions practice (including an appeal to the Ninth Circuit), a variety of hearings, and several discussions with the parties, the District Court "became increasingly concerned that individualized issues may predominate over class-wide issues, and that as a result, Plaintiff's class may no longer satisfy the Rule 23 requirements." Id.

---

[3] The applicability of the Supreme Court's holding in Wal-Mart is not restricted solely to employment cases. Rather, courts in the Fourth Circuit have relied upon Wal-Mart in several other contexts. See, e.g., Soutter v. Equifax Info. Servs., LLC, 2012 U.S. App. LEXIS 24891 (4th Cir. 2012) (unpublished) (class action alleging that potentially inaccurate court judgments appeared on the plaintiffs' credit reports); Gray v. Hearst Communs., Inc., 444 Fed. Appx. 698 (4th Cir. 2011) (unpublished) (class action involving breach of contract and unfair and deceptive trade practices claims related to the plaintiffs' purchase of advertisements in telephone directories); L.S. v. Delia, 2012 U.S. Dist. LEXIS 43822 (E.D.N.C. 2012) (unpublished) (class action involving allegations of due process violations by a North Carolina governmental agency related to alteration of Medicaid benefits).

After observing that "[t]he district court's order to grant class certification is subject to later modification, including class decertification," id., the District Court held that, "in spite of earlier indications that class treatment was feasible, the subsequent discovery, motion practice, and trial preparations has revealed that the requirement of predominate (sic) common issues is not satisfied." Id. at 488. Specifically, the District Court found that the plaintiffs had failed to "provide[] common proof to support a class-wide judgment as to liability," noting that, although "the jury may have [had] sufficient evidence to make judgments as to particular individuals, [it] . . . lack[ed] a basis to extrapolate from those findings to a class-wide judgment." Id. at 485.

## ARGUMENT

I. **DISCOVERY HAS SHOWN THAT THE CENTRAL ISSUES IN THIS CASE WILL REVOLVE AROUND CLASS ASCERTAINABILITY, DAMAGES, AND CAUSATION, REQUIRING HIGHLY INDIVIDUALIZED AND UNIQUE EVIDENCE PARTICULAR TO EACH PLAINTIFF AND CLASS MEMBER.**

Extensive discovery produced to date demonstrates that the central issues in this case revolve around class ascertainability, damages, and causation, each of which will require highly individualized and unique evidence particular to each Plaintiff and Class Member. Thus, Plaintiffs cannot satisfy the predominance requirement of Rule 23(b)(3), and this Court should decertify the class.

### A. Class Membership Must Be Ascertained Individually.

There can be no doubt that the fundamental question to be resolved in this litigation will be the extent and nature of any damage suffered by Plaintiffs and Class Members caused by TrimBoard installed on their structures. To address this issue, first and foremost, the trier of fact will need to determine whether a particular Plaintiff's or Class Member's structure in fact contains LP's TrimBoard at all. Such an undertaking is significantly more difficult than may appear at first blush, particularly because Plaintiffs possess at best limited knowledge about the

trim on their homes. For example, Plaintiff Lucille Druther testified that she did not know what portion of her home's trim actually was TrimBoard. <u>See</u> Deposition of Lucille Druther, taken January 28, 2010, attached hereto as Exhibit 4, at 23:11 to 25:20. Similarly, when asked to admit that few Class Members are aware that they have TrimBoard on their structures, Plaintiffs could state merely that, "after reasonable inquiry, they have insufficient information to respond . . . and the information that the Plaintiffs know or can readily obtain is insufficient to enable them to admit or deny." <u>See</u> Plaintiffs' Responses to LP's Requests for Admissions, attached hereto as Exhibit 5, at Nos. 10, 11. Plaintiffs' experts have confirmed that determining whether a specific structure even has TrimBoard will require expert inspections and potentially time-consuming and destructive examination of the attached trim and will vary with each individual claimant. <u>See</u> Deposition of Plaintiffs' expert Drew Brown, taken September 13, 2012, attached hereto as Exhibit 2A, at 37:7 to 38:21; Deposition of Plaintiffs' Expert Martin Phillips, taken April 26, 2012, attached hereto as Exhibit 1, at 88:10 to 90:6. In addition to establishing that individualized issues will predominate over any purported common issues in this litigation, these realities likewise undermine the continued ascertainability of Class Members, a further requirement that Plaintiffs must satisfy to maintain class action status. <u>See</u> <u>Deadwyler v.</u> <u>Volkswagen of America, Inc.</u>, 1986 U.S. Dist. LEXIS 28449, at *4-*5 (W.D.N.C. 1986) (unpublished) (noting that Rule 23(a) requires that "membership in each class is easily ascertainable").

Furthermore, in some instances, such as the homes of the Druther and Wuellner Plaintiffs, the initial determination of whether a particular structure contained TrimBoard is complicated by the fact that the structure has attached to it a mixture of trim products, including dimensional lumber, TrimBoard, and MiraTEC, another manufacturer's hardboard trim product

9

Case 2:08-cv-00047-BO   Document 158   Filed 01/09/13   Page 9 of 26

that is similar in appearance to LP's TrimBoard, as Plaintiffs' experts acknowledge. See Deposition of Plaintiffs' Expert Drew Brown, taken September 13, 2012, attached hereto as Exhibit 2A, at 36:5 to 37:6; Deposition of Plaintiffs' Expert Drew Brown, taken April 16, 2012, attached hereto as Exhibit 2B, at 122:25 to 123:24. For these structures, a board-by-board inspection must be conducted to identify which product is LP's TrimBoard product as opposed to that of another manufacturer, such as MiraTEC.

**B. Class Damages Must Be Determined Individually.**

In the event that a particular structure is determined to contain LP's TrimBoard, the jury then will be required to engage in the highly individualized and intensive task of determining the amount of TrimBoard on the structure and the percentage of that TrimBoard that has suffered damage. This process does not merely begin and end with counting the linear feet of covered TrimBoard on each structure. Should the limitations contained in the LP Warranty be found unconscionable (which LP maintains would be contrary to prevailing North Carolina law[4]), in addition to any compensable damages to the TrimBoard itself, the jury would be faced with the task of assessing the extent to which the TrimBoard is damaged and whether the damaged TrimBoard has resulted in consequential damages to the structure or other building components. Again, such damage will vary widely from Class Member to Class Member and will require individualized evidence for each claimant.

As Plaintiffs' experts concede, the condition of each Plaintiff's and Class Member's structure will need to be evaluated on an individual basis to determine into which category it falls: performing TrimBoard,[5] damaged TrimBoard, or consequential damages to other building

---

[4] See infra Footnote 8.
[5] It is well established that no cause of action for breach of express warranty and no recovery may be had in the absence of actual product failure. See e.g., Bussian v. DaimlerChrysler Corp., 411 F. Supp. 2d 614, 621 (M.D.N.C. 2006) (recognizing "the broad, nearly universally accepted proposition that a latent . . . defect known to the

materials.[6]   See Deposition of Plaintiffs' Expert Drew Brown, taken September 13, 2012,

attached hereto as Exhibit 2A, at 56:17 to 57:12; Deposition of Plaintiffs' Expert Martin Phillips,

taken April 26, 2012, attached hereto as Exhibit 1, at 86:11 to 86:21, 90:12 to 91:21, 110:13 to

111:5, 124:20 to 125:18, 130:1 to 131:2.   Striking disparities in the amount of damaged

TrimBoard are demonstrated in the inspection results for Plaintiffs' homes.  Plaintiff Gwen Hart

experienced damage to 714 out of 988 linear feet of TrimBoard (72%).  See Affidavit of Vernon

Tilley, attached hereto as Exhibit 3, at ¶ 34.  In contrast, only 13% of the TrimBoard on the

Wuellner Plaintiffs' home was damaged.  See id. at ¶ 37.  Likewise, of the 1,291 linear feet of

TrimBoard on the Druther Plaintiffs' home, only 280 linear feet had damage (22%).  See id. at ¶

39.  Inspections conducted by experts of other homes located in North Carolina yielded similar

results, with several communities, such as Cornelius, exhibiting almost no damage.  See Report

of Mark Kellogg, dated May 31, 2012, attached hereto as Exhibit 6B, at 4 ("One set of homes

was located in Cornelius . . . . The relatively modest amount of *TrimBoard* that was used in

features such as bandboards was generally in excellent condition, even though some areas

included clear violations of LP's instructions and good construction practice."); Report of

Richard Moore, dated May 31, 2012, attached hereto as Exhibit 7C, at 17 ("At residences in

Charlotte and Cornelius where TrimBoard had been used, the performance of the TrimBoard

product was found to be satisfactory despite widespread deviations from the manufacturer's

---

manufacturer at the time of sale that does not manifest itself until after expiration of the express warranty does not, in and of itself, give rise to a breach of express warranty claim").

[6] Although Plaintiffs contend that LP is liable for alleged consequential damages caused by TrimBoard to other building components, LP expressly denies such liability based upon the terms and limitations of the LP Warranty and application of the economic loss doctrine.  See Plaintiffs' Amended Complaint, Doc. No. 41, at Exhibit A; Ellis v. Louisiana-Pacific Corp., 699 F.3d 778, 783 (4th Cir. 2012) (affirming the District Court's holding that the economic loss doctrine barred the plaintiffs' tort-based claims because alleged consequential damages to other building materials caused purportedly by TrimBoard did not constitute damage to "property other than the product itself").

installation instructions. In comparison to natural wood products installed on these residences, I found the performance of TrimBoard to be equal to or better than natural wood trim.").

Although Plaintiffs assert a universal defect in TrimBoard, they have been unable to demonstrate through discovery that the asserted defect has resulted in universal damage; instead, any homeowner's claim will require a detailed inspection to determine whether all, some, or none of his or her TrimBoard has failed to perform as warranted. The Fourth Circuit has observed that such complexities in reaching appropriate damage calculations undermines the appropriateness of class certification pursuant to Rule 23(b)(3). See Windham v. Am. Brands, Inc., 565 F.2d 59, 66-67 (4th Cir. 1977) (holding that, when the certified class members' individualized damages are sufficiently complex that calculating them is more than a simple mechanical task, Rule 23(b)(3) does not permit certification). Rather, class certification under Rule 23(b)(3) is warranted only "in cases where the fact of injury and damage breaks down in what may be characterized as 'virtually a mechanical task,' 'capable of mathematical or formula calculation' . . . . [W]here the issue of damage and impact does not lend itself to such a mechanical calculation, . . . courts have found that the 'staggering problems of logistics' thus created 'make the damage aspect of [the] case predominate' . . . ." Id. at 68.

Resolution of the issue of damages for each specific Plaintiff and Class Member will require highly individualized and unique inquiries in each particular case. Contrary to Plaintiffs' representations to this Court in their initial Motion to Certify Class, this is not a simple product defect case; not every home has been damaged in the same way or to the same extent and not every homeowner is entitled to the same damages.

## C. Class Causation Must Be Determined Individually.

In addition to the numerous highly individualized questions regarding the specific damages incurred by particular Plaintiffs or Class Members, discovery likewise has demonstrated, through testimony from Plaintiffs' own experts, that adjudication of each claim will require an extensive review of the unique history of each structure to determine whether the damage to the TrimBoard is traceable to an alleged defect in the TrimBoard itself or to some other cause, such as improper installation, lack of maintenance, or other construction defects undermining the integrity of the building envelope. See Deposition of Plaintiffs' Expert Drew Brown, taken September 13, 2012, attached hereto as Exhibit 2A, at 142:8 to 143:5. For example, with regard to the Southport complex, Mark Kellogg, one of LP's experts, stated as follows: "Where problems with the *TrimBoard* were observed, they were clearly the result of one or a combination of errors including failure to follow LP's instructions and poor construction practices. Such errors were clearly evident in problems observed at the Southport complex, but were certainly exaggerated by the harsh conditions imposed by a coastal environment." Report of Mark Kellogg, dated May 31, 2012, attached hereto as Exhibit 6B, at 5. Similarly, Richard Moore's report contains the following identification of potential causes of damaged TrimBoard at Southport: "Based on my observations at the Southport site, . . . [t]he deterioration of the trim (both natural wood and TrimBoard), the degree of trim replacement completed prior to my site visit, and other repairs to the three building envelopes over time point to problems with the construction of the water management system of the building envelope." Report of Richard Moore, dated December 28, 2012, attached hereto as Exhibit 7D, at 7-9.

Although Plaintiffs hope to escape such limitations through their vague and unsupported assertions concerning unconscionability, the LP Warranty states specifically that it "is effective

only if the product is properly installed in accordance with the LP ABT TrimBoard Application Instructions," and that "LP shall not be liable for damage or defects resulting from or due to circumstances beyond LP's control, including but not limited to use of the product for purposes other than for which it was designed, failure to follow installation instructions, [or] failure to provide reasonable and necessary maintenance." See Plaintiffs' Amended Complaint, Doc. No. 41, at Exhibit A. Thus, in each case, the applicability of such exclusions must be considered by the jury in reaching a determination as to the amount of compensable damages for each specific claimant.

Common sense dictates that, once a building product such as TrimBoard is installed, errors in installation by contractors or improper maintenance by a homeowner inevitably will be a potential cause of any harm that is done to that building product. See In re Stucco Litig., 175 F.R.D. 210, 214 (E.D.N.C. 1997) ("The relevance of third parties to the [stucco] litigation cannot be disputed."). Indeed, the Fourth Circuit already has identified such core causation issues as precluding class certification. See Lienhart v. Dryvit Systems, Inc., 255 F.3d 138, 149 (4th Cir. 2001). In Lienhart, the defendants contended that "the need to assess the contribution of third-party contractors to the failure of [the] stucco siding product . . . destroy[ed] predominance." Id. at 148. Agreeing with this assertion, the Fourth Circuit decertified the class, holding that regardless of the plaintiffs' choice to sue only the manufacturers of the subject product, if the stucco's failure was in fact due to a contractor's faulty installation of it, then "individualized proof of damage causation" would destroy predominance. Id. at 149. Specifically, the court observed that "defining the parameters of the class for whom Dryvit's liability can be determined based on classwide proof may require the district court to probe deeply into the individualized details of applicator and contractor behavior with respect to each Fastrak installation, because

14

Dryvit cannot be adjudged liable to class members whose injuries were caused in part by applicators and contractors . . . . If such an individualized inquiry is needed to determine the membership of a workable class, it is clear that common issues do not predominate." Id.

In the present case, TrimBoard has been installed on thousands of different homes in the state of North Carolina. As Plaintiffs' experts recognize, these homes likely were built by hundreds of different contractors, trim installers, and painters, with the TrimBoard installed alongside a variety of other building components that integrate with TrimBoard and cause it to perform in different ways, e.g., brick, stucco, fiber cement siding, wood siding, windows, metal flashing (or the lack thereof) and roofs, masonry and asphalt shingles. See Deposition of Plaintiffs' Expert Drew Brown, taken April 16, 2012, attached hereto as Exhibit 2B, at 122:25 to 123:24; Deposition of Plaintiffs' Expert Drew Brown, taken September 13, 2012, attached hereto as Exhibit 2A, at 36:5 to 37:6; see also Report of Mark Kellogg, dated May 31, 2012, attached hereto as Exhibit 6B, at 3-5. Likewise, such homes are located in different geographical areas in North Carolina with varying levels of exposure to the elements, such as sun, rainfall, and humidity. See Report of Mark Kellogg, dated May 31, 2012, attached hereto as Exhibit 6B, at 2.

Furthermore, the quality of maintenance and installation, and the level of adherence to LP's application instructions, building codes, and good construction practices, varies widely. Plaintiffs themselves have been unable to demonstrate through discovery that the TrimBoard on their particular homes was installed and maintained as required by the LP Warranty. For example, Plaintiffs Lucille Druther and Jennifer Wuellner testified that they did not know whether any TrimBoard on their homes was property installed or maintained, or even how it failed. See Deposition of Lucille Druther, taken January 28, 2010, attached hereto as Exhibit 4, at 60:1 to 69:19; Deposition of Jennifer Wuellner, taken January 29, 2010, attached hereto as

15

Exhibit 8, at 60:1 to 72:1. Similarly, Plaintiff Gwen Hart testified that she was unable to state whether her TrimBoard had been installed or maintained properly. See Deposition of Gwen Hart, taken September 23, 2009, attached hereto as Exhibit 9, at 68:3 to 69:18. As to the Class Members, Plaintiffs have indicated that they likewise are incapable of establishing whether the TrimBoard attached to the Class Members' homes was installed or maintained properly. See Plaintiffs' Responses to LP's Requests for Admissions, attached hereto as Exhibit 5, at Nos. 43-47.

As both Plaintiffs' and LP's experts have noted, all of these factors create a virtually limitless combination of circumstances that have a direct impact on the performance of TrimBoard in specific situations. See Deposition of Plaintiffs' Expert Drew Brown, taken September 13, 2012, attached hereto as Exhibit 2A, at 142:8 to 143:5; Report of Mark Kellogg, dated May 31, 2012, attached hereto as Exhibit 6B, at 3-5; Report of Mark Kellogg, dated December 28, 2012, attached hereto as Exhibit 6C, at 1-6; Report of Richard Moore, dated November 23, 2009, attached hereto as Exhibit 7B, at 3-5, 8; Report of Richard Moore, dated May 31, 2012, attached hereto as Exhibit 7C, at 16-17; Report of Richard Moore, dated December 28, 2012, attached hereto as Exhibit 7D, at 7-10. As a result, although most TrimBoard performs as intended, some TrimBoard is found to be damaged; determining why a certain piece of TrimBoard is damaged requires a detailed, fact-specific inquiry into various construction, installation, design, and/or maintenance issues. See Affidavit of Vernon Tilley, attached hereto as Exhibit 3, at ¶ 21. Even if Plaintiffs' theory that TrimBoard is inherently defective is correct, TrimBoard's supposed defect does not mean that, as to each Plaintiff or Class Member, TrimBoard's allegedly defective design is what caused it to fail in any particular

instance. There simply is no classwide answer to the crucial question: "Why did a certain piece of TrimBoard fail?"

In sum, Plaintiffs' representations to this Court in their Motion to Certify Class regarding the uniformity of damages and causation and the ease with which appropriate awards can be calculated for particular Class Members have not been proven through discovery. Rather, the trier of fact will be faced with conducting individual determinations for each claimant regarding, among other things, the identify of the manufacturer of trim attached to the particular structure, the extent of damaged TrimBoard, the cause of damage to the TrimBoard, the costs of replacement or repair of such TrimBoard, and the cause and extent of any consequential damages. The efficiencies for which class action treatment is designed simply would not be served under these circumstances in light of the predominance of such highly-individualized and unique issues. Thus, this Court should decertify the class and permit Plaintiffs to proceed solely on their individual claims.

## II.     DISCOVERY HAS SHOWN THAT TRIMBOARD IS NOT UNIFORMLY DEFECTIVE.

With regard to the predominance requirement of Rule 23(b)(3), Plaintiffs' Motion to Certify Class focused initially upon Plaintiffs' allegation that TrimBoard contained an inherent defect which inevitably would cause the product to fail, the existence of which supposedly would be subject to classwide proof. See Plaintiffs' Memorandum in Support of Plaintiffs' Motion to Certify Class, Doc. No. 75, at 20-22. The evidence produced in discovery to date, however, establishes conclusively that TrimBoard is not an inherently defective product, such that this litigation cannot continue as a class action based upon that purported commonality.

As noted above, the vast majority of TrimBoard in North Carolina has performed well and is undamaged after many years of service. Although Plaintiffs admit that there are "as many

as 11,258 homes in North Carolina containing . . . Trimboard," see id. at 10, and despite the fact

that TrimBoard was sold from 1994 to 2008, Plaintiffs concede that there have been "only about

50 claims" in North Carolina, resulting in a claims rate of less than one-half of one percent

(0.44%). See id. at 28; Affidavit of Vernon Tilley, attached hereto as Exhibit 3, at ¶ 8 (noting 55

claims). In communities such as Cornelius, almost no TrimBoard has exhibited damage. See

Report of Mark Kellogg, dated May 31, 2012, attached hereto as Exhibit 6B, at 4; Report of

Richard Moore, dated May 31, 2012, attached hereto as Exhibit 7C, at 17.

Even on each Plaintiff's structure, not all TrimBoard is damaged, undermining further

Plaintiffs' assertion that the product contains an inherent defect. Plaintiff Gwen Hart

experienced damage to 72% of her TrimBoard (714 of 988 linear feet), the Wuellner Plaintiffs

saw only 13% damage, and the Druther Plaintiffs only 22% (280 of 1,291 linear feet).[7] See

Affidavit of Vernon Tilley, attached hereto as Exhibit 3, at ¶¶ 34, 37, 39. Some Class Members'

homes identified by Plaintiffs' experts and inspected by both Plaintiffs' and LP's experts have no

damaged TrimBoard at all. See Deposition of Plaintiffs' Expert Martin Phillips, taken April 26,

2012, attached hereto as Exhibit 1, at 86:11 to 86:21, 90:12 to 91:21, 110:13 to 111:5, 124:20 to

125:18, 130:1 to 131:2; Report of Mark Kellogg, dated May 31, 2012, attached hereto as Exhibit

6B, at 3-5. Thus, to the extent this Court certified the class at issue in this litigation upon the

premise that Plaintiffs had alleged the existence of a common defect in TrimBoard shared by all

Class Members that would result in uniform damage to all TrimBoard attached to all structures,

discovery has demonstrated the invalidity of this contention. Therefore, decertification of the

class is required. See Rule 23(c)(1)(C).

---

[7] In fact, much of the TrimBoard attached to the Wuellner and Druther Plaintiffs' homes continues to perform as warranted despite having been installed more than ten years ago, exceeding the applicable LP Warranty period. See Report of Mark Kellogg, dated December 28, 2012, attached hereto as Exhibit 6C, at 3-5.

### III. CONSCIONABILITY OF THE TERMS AND LIMITATIONS CONTAINED IN THE LP WARRANTY DOES NOT PREDOMINATE OVER INDIVIDUALIZED ISSUES.

Plaintiffs' central contention regarding the appropriateness of class certification concerns their allegation that the terms and limitations contained in the LP Warranty are unconscionable, and that such unconscionability is a common issue shared by all Plaintiffs and Class Members. But "[w]hat matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." Wal-Mart, 131 S. Ct. at 2551. To justify class treatment, Plaintiffs' "claim[] must depend upon a common contention," one that "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each of the claims in one stroke." Id.

In this case, Plaintiffs' and Class Members' claims do not depend fundamentally upon a supposedly "common" contention of unconscionability of the LP Warranty. Plaintiffs do not merely assert a declaratory judgment action concerning the enforceability of a contract in the abstract; rather, Plaintiffs have pursued an action for damages based upon LP's purported liability under the LP Warranty due to the alleged failure of LP's TrimBoard to perform as warranted when installed on specific buildings. Such a claim requires proof of the following elements: (1) an express warranty exists between the parties; (2) the product failed to perform as warranted; (3) the plaintiff made a claim under the warranty; (4) the defendant failed to provide the relief specified in the warranty; and (5) the amount of covered damages. See Harbour Point Homeowners Assoc., Inc. v. DJF Enterprises, Inc., 697 S.E.2d 439, 447 (N.C. App. 2010). Unconscionability is not a separate cause of action that would form the basis for imposing liability on LP; instead, Plaintiffs simply seek to deny LP the ability to rely upon certain

warranty terms that, as to some plaintiffs, might bar recovery. Thus, the question of unconscionability of the LP Warranty is not "central to the validity of each one of the claims" such that its determination would resolve the claims "in one stroke." Therefore, Plaintiffs' reliance upon the doctrine is insufficient to support classwide treatment.

Even if case law supported a finding that the terms and limitations contained in the LP Warranty are unconscionable, which it does not,[8] particularly in light of the demonstrated lack of inherent defect in TrimBoard (upon which Plaintiffs' assertions regarding the applicability of the doctrine of unconscionability rely inherently),[9] reaching even that determination would require an individualized inquiry into the specific nature of each Plaintiff's and Class Member's relationship with LP and the TrimBoard on their structures. Under North Carolina law, both procedural and substantive unconscionability must be present for the court to apply the doctrine to void certain contractual terms, _i.e._, the court must find "not only the employment of sharp practices and the use of fine print and convoluted language, but a lack of understanding and an inequality of bargaining power." Rite Color Chem. Co., Inc. v. Velvet Textile Co., Inc., 411 S.E.2d 645, 648 (N.C. App. 1992). As the North Carolina Supreme Court has observed, "[a]n inquiry into unconscionability requires that a court 'consider all the facts and circumstances of a particular case.'" Tillman v. Commercial Credit Loans, Inc., 655 S.E.2d 362, 369 (N.C. App. 2008); see also N.C. Gen. Stat. § 25-2-302(2) ("When it is claimed or appears to the court that

---

[8] See, e.g., Kelly v. Georgia-Pacific, LLC, 671 F. Supp. 2d 785, 798 (E.D.N.C. 2009) ("As for Kelly's argument concerning the remedy cap of double the sales price of the Prime Trim, the remedy cap is consistent with N.C. Gen. Stat. § 25-2-719, and the limited warranty does not fail of its essential purpose."). See also Ellis v. Louisiana-Pacific Corp., 699 F.3d 778, 787 (4th Cir. 2012) (holding that the plaintiffs' allegations that LP "fail[ed] to give adequate warning and notice about the allegedly defective quality of Trimboard" and "fail[ed] to insure that they were provided with an express warranty" were insufficient to state a cause of action under North Carolina's Unfair and Deceptive Trade Practices Act because the allegations, even if true, did not amount to unfair or deceptive trade practices as a matter of law).
[9] See, e.g., Plaintiffs' Amended Complaint, Doc. No. 41, at ¶ 59 ("ABTCO's warranty limitations of remedies is (sic) unconscionable given that it knew or should have known that the trimboard was defective in design and construction, . . . that ABTCO knew or should have known of the defects with its product; and that ABTCO concealed from consumers and/or failed to disclose to consumers the defects with its product.").

the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination.").

Here, Plaintiff Gwen Hart, who relied upon her husband to select, purchase, and install TrimBoard, see Deposition of Gwen Hart, taken September 23, 2009, attached hereto as Exhibit 9, at 15:3 to 21:11, differs sharply from the Wuellner and Druther Plaintiffs, who bought homes on which TrimBoard already had been installed by the builders, see Deposition of Jennifer Wuellner, taken January 29, 2010, attached hereto as Exhibit 8, at 11:10 to 13:15; Deposition of Lucille Druther, taken January 28, 2010, attached hereto as Exhibit 4, at 12:8 to 13:25; Plaintiffs' Responses to LP's Requests for Admissions, attached hereto as Exhibit 5, at Nos. 18, 26, 28. Such stark contrasts between individual circumstances can be presumed among the Class Members, as to whom Plaintiffs admit they lack sufficient evidence to say whether Class Members made the decision to purchase TrimBoard, purchased the TrimBoard, or installed it themselves. See Plaintiffs' Responses to LP's Requests for Admissions, attached hereto as Exhibit 5, at Nos. 18, 26, 28.

Thus, Plaintiffs' allegations concerning unconscionability depend upon, among other things, how unfair the express limitations in the LP Warranty are under each individual's commercial circumstances and with respect to Plaintiffs' individualized damages.[10]  Likewise, evaluating the validity of such an unconscionability argument will require individualized inquiries into whether a builder or other installer had a choice of trim.  These facts necessarily

---

[10] To the extent Plaintiffs contend that the LP Warranty is unconscionable because LP's applications instructions were not provided with the product, Plaintiffs have failed to produce evidence in discovery to support such an allegation.  The Wuellner and Druther Plaintiffs admitted that they did not know whether the contractors and subcontractors who built their homes and installed the TrimBoard read or followed LP's application instructions. See Plaintiffs' Responses to LP's Requests for Admissions, attached hereto as Exhibit 5, at Nos. 43, 44.  As to Plaintiff Gwen Hart, her husband, the builder of her home, testified that he in fact had received a copy of LP's application instructions.  See Deposition of Terry Hart, taken September 23, 2009, attached hereto as Exhibit 10, at 40:4 to 40:24.

will vary from Plaintiff to Plaintiff and from Class Member to Class Member, and it "will be impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question." Wal-Mart, 131 S. Ct. at 2552. Given the criteria for evaluating whether a warranty is unconscionable, the circumstances surrounding the "purchase" of the product as well as the nature and extent of any damage must be considered in each individual case, preventing this Court from determining whether the terms and limitations contained in the LP Warranty are unconscionable on a classwide basis.

Furthermore, it is well established that a class cannot be certified if a defendant's defenses depend upon facts unique to each plaintiff's case. See Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331, 342 (4th Cir. 1998); see also Wal-Mart, 131 S. Ct. at 2560-61 (holding that a class cannot be certified if a defendant will not be entitled to litigate its defenses to individual claims). Here, the doctrine of unconscionability serves merely to rebut LP's defense as to individual claims based on the terms and limitations of the LP Warranty. Thus, class treatment is not appropriate because LP possesses individualized defenses to each Plaintiff's and Class Member's claims based upon improper installation or failure to conduct appropriate maintenance particular to each case, and because Plaintiffs' reliance upon the doctrine of unconscionability is tied directly to the viability of those defenses. See Broussard, 155 F.3d at 342; Wal-Mart, 131 S. Ct. at 2560-61.

As noted above, Plaintiffs' assertion that the terms and conditions of the LP Warranty are unconscionable merely is a threshold issue and not one that is central to the validity of Plaintiffs' or Class Members' claims. Instead, even if the LP Warranty is deemed unconscionable (an individualized determination in and of itself), as explained above, mini-trials will be required to determine the amount of damaged TrimBoard for each particular claimant and whether such

damage was caused by the TrimBoard itself or some other cause, such as improper installation or lack of maintenance. In light of the predominance of these highly individualized and unique issues, classwide treatment would not serve to advance this litigation in any material respect. For these reasons, this Court should grant LP's Motion to Decertify and direct Plaintiffs to pursue their claims solely on an individual basis.

## IV. "OPT-IN" TREATMENT IS NOT AVAILABLE FOR DAMAGES CLASS ACTIONS UNDER RULE 23(B)(3).

At the January 2, 2013 hearing out of which this Court's Order for the parties to brief the issue of class certification arose, the Court inquired as to whether the certified class in this case could be identified as an "opt-in" class rather than an "opt-out" class. Based upon LP's review of Rule 23 and applicable case law, it appears that "opt-in" classes are available primarily in the context of actions brought pursuant to the Fair Labor Standards Act, 29 U.S.C. § 216(b), which provides that "[n]o employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." See, e.g., McLaurin v. Prestage Foods, Inc., 271 F.R.D. 465, 472 (E.D.N.C. 2010) ("Here, plaintiffs' FLSA claims can be asserted in a collective action, but Congress specifically chose to implement an opt-in procedure, which means that a potential plaintiff only enters an FLSA case if he or she affirmatively chooses to opt in. . . . However, Rule 23(b)(3) uses an opt-out procedure, which means that plaintiffs are automatically part of the class unless they opt out."); see also Ackal v. Centennial Beauregard Cellular LLC, 700 F.3d 212 (5th Cir. 2012) ("Unlike these types of statutory collective actions, however, proceedings under Rule 23 do not require that class members affirmatively 'opt in,' nor is such a requirement mandated by due process considerations. . . . Indeed, as one of our sister circuits aptly has noted, '[n]ot only is an 'opt in' provision not required, but substantial legal authority supports the view that by adding

the 'opt out' requirement to Rule 23 . . . , Congress <u>prohibited</u> 'opt in' provisions by implication.'"). Thus, it does not appear that Plaintiffs can proceed in this litigation under the auspices of an "opt-in" class; rather, LP contends that class action treatment of Plaintiffs' claim altogether is inappropriate for the reasons stated herein.

## <u>CONCLUSION</u>

For these reasons, LP requests respectfully that this Court enter the attached Order decertifying the class and directing Plaintiffs to pursue their claims solely on an individual basis.

Respectfully submitted, this the 9th day of January, 2013.

*/s/ Richard T. Boyette*
Richard T. Boyette, NC Bar No. 7623
Meghan N. Knight, NC Bar No. 35384
Cranfill Sumner & Hartzog, LLP
P.O. Box 27808
Raleigh, NC 27611-7808
Tel: (919) 828-5100
Fax: (919) 863-3519
rtb@cshlaw.com

James E. Weatherholtz, Fed. Bar No. 7473
Womble Carlyle Sandridge & Rice, LLP
5 Exchange Street
P.O. Box 999
Charleston, SC 29402-0999
Tel: (843) 722-3400
Fax: (843) 722-7398
jweatherholtz@wcsr.com

John Parker Sweeney, Fed. Bar No. 8761
T. Sky Woodward, Fed. Bar. No. 10823
Womble Carlyle Sandridge & Rice, LLP
250 West Pratt Street
Suite 1300
Baltimore, MD 21201
Tel: (410) 545-5800
Fax: (410) 545-5801
jsweeney@wcsr.com

*Attorneys for Defendant Louisiana-Pacific Corp.*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION

GWEN HART, JOSEPH DRUTHER, ) Civil Action No. 2:08-cv-00047-BO
LUCILLE DRUTHER, EDWARD )
WUELLNER, and JENNIFER WUELLNER, )
individually and on behalf of all others )
similarly situated, )
 )
Plaintiffs, )
 )
vs. )
 )
LOUISIANA-PACIFIC CORPORATION, )
 )
Defendant. )
 )

## CERTIFICATE OF SERVICE

I hereby certify that on January 9, 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Daniel K. Bryson, Esq.
Scott C. Harris, Esq.
Whitfield Bryson & Mason, LLP
900 W. Morgan Street
Raleigh, ND 27603
dan@wbmllp.com
scott@wbmllp.com
*Attorneys for Plaintiffs*

Auley M. Crouch, III, Esq.
Christopher K. Behm, Esq.
Block Crouch Keeter Behm & Sayed, LLP
P.O. Box 4
Wilmington, NC 28402
acrouch@bcklawfirm.com
cbehm@bcklawfirm.com
*Attorneys for Plaintiffs*

Gary E. Mason, Esq.
Nicholas A. Migliaccio, Esq.
Charles A. Schneider, Esq.
Whitfield Bryson & Mason, LLP
1625 Massachusetts Ave., NW, Suite 605
Washington, DC 20036
gmason@wbmllp.com
nmigliaccio@wbmllp.com
cschneider@wbmllp.com
*Attorneys for Plaintiffs*

Joel R. Rhine, Esq.
Rhine Law Firm, PC
314 Walnut Street, Suite 1000
Wilmington, NC 29401
jrr@lrlawfirm.com
*Attorney for Plaintiffs*

25

*/s/ Richard T. Boyette*

Richard T. Boyette, NC Bar No. 7623
Meghan N. Knight, NC Bar No. 35384
Cranfill Sumner & Hartzog LLP
P.O. Box 27808
Raleigh, NC 27611-7808
Tel: (919) 828-5100
Fax: (919) 863-3519
rtb@cshlaw.com

*Attorney for Defendant Louisiana-Pacific Corp.*